

# Collection Account Management Agreement

**BOMBSHELL**

Dated as of the 15th day of July, 2020

**COLLECTION ACCOUNT MANAGEMENT AGREEMENT**

**RE: "BOMBSHELL"**

**AGREEMENT** dated as of the 15th day of July, 2020

**BETWEEN:**

(1)    **FREEWAY CAM B.V.** (a company registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands, registration no.: 34163572, date of incorporation: October 18, 2001) c/o Andrássy út 12, 1061 Budapest, Hungary ("**FCAM**");

(2)    **STICHTING FREEWAY CUSTODY** (a foundation registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands, registration no.: 34176856, date of incorporation: July 25, 2002) c/o Andrássy út 12, 1061 Budapest, Hungary ("FCustody"); and

(3)    **THOSE PERSONS, FIRMS OR OTHER ENTITIES SPECIFIED IN SCHEDULE 1 HERETO** (together with FCAM and FCustody "**Parties**" and individually "**Party**" which expressions shall include each of the Parties' successors in title and assigns).

**IT IS HEREBY AGREED** that the Parties jointly appoint FCustody to open and maintain the "Collection Account" (as defined herein) and that FCustody accepts such appointment.

Furthermore, it is hereby agreed that the Parties jointly appoint FCAM as their sole and exclusive agent to administer the collection and distribution of Collected Gross Receipts, to calculate the Entitlements (as defined below), and to provide Statements (as defined below) to the Parties, on behalf of the Parties in accordance with the provisions of the Schedules hereto and FCAM's Standard Terms of Agreement (attached hereto and incorporated by this reference) and that, in consideration of FCAM's Remuneration (as defined herein), FCAM accepts such appointment and agrees to perform the services set out in this Agreement. In the event of a conflict between FCAM's Standard Terms of Agreement and the Schedules, the Schedules shall control.

# SCHEDULE 1

## Names and Addresses of the Parties

- **LUCITE DESK, LLC**, registration no.: 36-4902546, date of incorporation: June 11, 2018, registered address: 345 North Maple Drive, Suite 294, Beverly Hills, CA 90210, United States of America, attention: Joel Guralnick, email: jguralnick@bronstudios.com, telephone: +1 226-828-9516 ("**Producer**" which expression shall be deemed to include its successors in title and permitted assigns);

- **BRON STUDIOS USA INC.**, registration no.: C3946017, date of incorporation: 14 September 2016, registered address: 345 North Maple Drive, Suite 294, Beverly Hills, CA 90210, United States of America, attention: Joel Guralnick, email: jguralnick@bronstudios.com and collections@bronstudios.com, telephone: +1 226 828 9516 ("**BRON**" which expression shall be deemed to include its successors in title and permitted assigns);

- **CREATIVE WEALTH MEDIA FINANCE CORP.**, registration no.: 002375360, date of incorporation: May 31, 2013, registered address: 151 Bloor Street West, Suite 700, Toronto, ON, M5S 1S4, Canada, attention: Jason Cloth, email: jason.cloth@cwmoviefund.ca, telephone: +1 416 410 6423 ("**Creative Wealth**" which expression shall be deemed to include its successors in title and permitted assigns);

- **CREATIVE WEALTH MEDIA LENDING LP 2016**, registration no.: 260562988, date of incorporation: May 30, 2016, 151 Bloor Street West, Suite 700, Toronto, ON M5S 1S4, Canada, attention: Richard McConnell, email: richard.mcconnell@cwmoviefund.ca and Catharine Piccioli, email: Catharine.Piccioli@cwmoviefund.ca, telephone: + 1 416 410 6423 ("**CWM Lending**" which expression shall be deemed to include its successors in title and permitted assigns);

- **CAST & CREW FINANCIAL SERVICES, LLC,** registration no.: 201334010185, date of incorporation: 4 December 2013, registered address: 2300 Empire Avenue, 5th Floor, Burbank, CA 91504, United States of America, attention: Deirdre Owens, email: Deirdre.owens@castandcrew.com, telephone: +1 818 848 6022, +1 818 972 3201, +1 818 480 0187 ("**C&C**" which expression shall be deemed to include its successors

in title and permitted assigns); and

-  **ANNAPURNA PRODUCTIONS, LLC**, registration no.: 200729110218, date of incorporation: 16 October 2007, registered address: 812 N. Robertson Boulevard, West Hollywood, CA 90069, United States of America, attention: Chris Corabi, email: chrisc@annapurnapics.com, telephone: +1 310 724 5678 ("**AP**" which expression shall be deemed to include its successors in title and permitted assigns).

# SCHEDULE 2

## Definitions

In this Agreement the following words and expressions shall have the meanings hereby ascribed to them which meanings shall apply to this Agreement, including FCAM's Standard Terms of Agreement and the Schedules hereto:

**"Accounting Currency"**    United States dollars ("USD");

**"Accounting Period"**    one of the individual periods described in Clauses 4.1, 4.2 and 4.3 of FCAM's Standard Terms of Agreement;

**"Additional Delivery Expenses"**    any actual, direct, verifiable out of pocket third party distribution, business and marketing expenses directly related to the Film which are not included in the budget for the Film or not assumed or paid by any third-party Distributor of the Film (including, without limitation, any unbudgeted delivery materials required to be delivered to Distributors of the Film) and which have been mutually approved by BRON and Creative Wealth in advance in writing and advised to FCAM by Producer, which shall not exceed 10% of the budget of the Film;

**"Agreement"**    this collection account management agreement (including the Schedules hereto and FCAM's Standard Terms of Agreement) made between the Parties hereto;

**"AP Indebtedness"**    all monetary obligations, contingent and otherwise, to AP under the AP Quitclaim Agreement, including, without limitation, all interest thereon, and all fees, costs and expenses Producer is obligated to pay AP thereunder, the exact amounts to be notified in writing to FCAM by AP;

**"AP Quitclaim Agreement"**    the Quitclaim Agreement dated effective as of October 9, 2018 by and between AP and BRON pursuant to which

AP has advanced the principal amount of USD3,995,396.03 in relation to the Film;

**"AP Repayment Notice"**  written notice from AP to FCAM, copied to Creative Wealth and Producer, that the AP Indebtedness has been paid in full;

**"Beneficiary(ies)"**  those Persons who are entitled to part of the Collected Gross Receipts specified in Schedule 4;

**"Business Day"**  any day excluding Saturdays, Sundays and any days which are public holidays in the country in which any of the Parties has its principal place of business;

**"Collected Gross Receipts"**  all Gross Receipts actually received in or credited to the Collection Account, and interest thereon and the Deemed Collected Gross Receipts;

**"Collection Account"**  a designated, segregated, interest bearing bank account held in the name of FCustody on behalf of each of the Beneficiaries in proportion to their respective Entitlements under this Agreement, and referring to the name of the Film into which all Gross Receipts are paid, established with:

| | |
|---|---|
| Comerica Bank | (**"CA Bank"**) |
| Bank Address: | 2000 Avenue of the Stars, 2nd Floor, Los Angeles, CA 90067 |
| ABA Routing No.: | 121 137 522 |
| SWIFT Code: | MNBDUS33 |
| Account Holder: | Stichting Freeway Custody |
| Subtitle: | Bank controlled account – Fair and Balanced |
| Account Number: | 1895009718; |

**"Collection Account Interest"**  any interest accrued on the Collection Account at the CA

Bank;

**"Creative Wealth Indebtedness"** all monetary obligations, contingent and otherwise, to Creative Wealth under the Creative Wealth Loan Agreement, including, without limitation, all interest thereon, plus any and all fees, costs and expenses Producer is obligated to pay Creative Wealth thereunder, the exact amounts to be notified in writing to FCAM by Creative Wealth;

**"Creative Wealth Loan Agreement"** the Loan Agreement and Promissory Note dated effective as of October 17, 2018 by and between Creative Wealth and Producer as amended in accordance with that certain Amendment to the Loan and Security Agreement dated as of January 23, 2019, pursuant to which Creative Wealth has advanced the principal amount of USD7,698,239 (inclusive of financing fees) in relation to the Film;

**"Creative Wealth Repayment Notice"** written notice from Creative Wealth to FCAM copied to Producer and AP that the Creative Wealth Indebtedness has been paid in full;

**"CWM Lending Indebtedness"** all monetary obligations, contingent and otherwise, to CWM Lending under the CWM Lending Loan Agreement, including, without limitation, all interest thereon, plus any and all fees, costs and expenses Producer is obligated to pay CWM Lending thereunder, the exact amounts to be notified in writing to FCAM by CWM Lending;

**"CWM Lending Loan Agreement"** the Promissory Note dated effective as of October 17, 2018 by and between CWM Lending and Producer as amended in accordance with that certain Amendment to

the Loan and Security Agreement dated as of January 23, 2019, pursuant to which CWM Lending has advanced the principal amount of USD7,698,239 (inclusive of financing fees) in relation to the Film;

**"CWM Lending Repayment Notice"**

written notice from CWM Lending to FCAM copied to Producer and AP that the CWM Lending Indebtedness has been paid in full;

**"Deemed Collected Gross Receipts"**

all Gross Receipts received by or credited to a Party or a Beneficiary or any other third party other than FCAM, which ought to, in accordance with this Agreement, have been credited to the Collection Account. The Producer or any other Party receiving Prior Disbursement Gross Receipts shall promptly notify FCAM of any such Person receiving Prior Disbursement Gross Receipts and the exact amounts and the source of such Prior Disbursement Gross Receipts;

**"Delivery Date"**

the date upon which the Film is delivered in accordance with the provisions of the Lions Gate Distribution Agreement;

**"Distribution Agreement(s)"**

every agreement in connection with the exploitation, distribution, sale, leasing, license, exhibition, transmission, or any other form of exploitation of the Film, or any associated rights, merchandising, secondary, publishing, allied or ancillary rights of the Film or the Rights in any part of the Territory through any existing or future product, service or platform, including, but not limited to the Lions Gate Distribution Agreement;

**"Distributors"**

those Persons who have entered or will enter into Distribution Agreements, including, but not limited to Lions

Gate;

**"Entitlement(s)"**      that part of the Collected Gross Receipts payable to a Beneficiary pursuant to the terms of this Agreement;

**"Executing Parties"**      FCAM, FCustody, Creative Wealth, CWM Lending, Tax Credit Lender, the Producer and BRON;

**"FCAM Expenses"**      all actual, reasonable, verifiable, third party, customary, reasonable, out-of-pocket direct expenses incurred by FCAM in relation to its duties and obligations as provided for in this Agreement such expenses not to exceed the amount of USD2,500 per annum without the prior written consent of Producer and Creative Wealth;

**"FCAM's Remuneration"**      a one off amount of USD5,000 payable off the top from first Collected Gross Receipts in two equal shares of USD2,500 each under the first two Statements issued; 1% of all Collected Gross Receipts until all Collected Gross Receipts reach an aggregate amount of USD2,000,000; thereafter 0.75% of all Collected Gross Receipts until the aggregate of all Collected Gross Receipts reach an amount of USD4,000,000 PROVIDED THAT FCAM will not apply this 0.75% between USD2,000,000 and USD2,500,000 of Collected Gross Receipts, and 0.5% of all Collected Gross Receipts thereafter;

**"Film"**      the feature film provisionally entitled "Bombshell" a brief specification of which is set out in Schedule 3;

**"Financier Agreements"**      collectively the Creative Wealth Loan Agreement, the Tax Credit Lender Loan Agreement and the AP Quitclaim Agreement;

**"Forum"**      the venue for legal proceedings being Los Angeles, California;

**"Gross Receipts"**                    one hundred percent (100%) of all monies or any other proceeds received by Producer as the "Grantor's Share" under the Lions Gate Distribution Agreement (but specifically excluding any "Grantors Costs for Claims" as defined and provided for thereunder) and all cash sums received by or on behalf of and/or credited to or on behalf of the Producer and its affiliated entities from any Distributions Agreements and all forms of distribution and other exploitation of the Film or the Rights and the elements thereof and all allied, ancillary and subsidiary rights therein (including, without limitation, merchandising, in any and all media now known or hereafter devised throughout the world in perpetuity, including, without limitation, the net amount of any insurance proceeds and claim recoveries (except if such amounts are used solely to finance production of the Film) and the net amount of any audit settlements and rebates or credits (except if such amounts are used solely to finance the Film); provided that such insurance proceeds, claim recoveries, audit settlements and rebates or credits (including Tax Credit Excess) shall not be subject to, (i) FCAM Remuneration or FCAM Expenses, and (ii) reasonable outside legal fees and expenses for any Distribution Agreements. Gross Receipts shall exclude, until Tax Credit Lender has issued a Tax Credit Lender Repayment Notice, any Tax Credits which shall be paid directly to Tax Credit Lender to repay the Tax Credit Lender Indebtedness, and, if Tax Credit Lender has issued a Tax Credit Lender Repayment Notice, any Tax Credit Excess shall be paid in accordance with the Interparty Agreement, and thereafter if the AP Indebtedness and the Creative Wealth Indebtedness have been paid in full, the Tax Credit Excess shall be included in Gross Receipts;

| | |
|---|---|
| **"Irrevocable Instructions"** | the Irrevocable Instructions and Notice Of Acknowledgement substantially in the form of Schedule 6 attached hereto which contains irrevocable instructions directing the relevant Distributor to remit all Gross Receipts payable under its Distribution Agreement to the Collection Account; |
| **"Lions Gate"** | Lions Gate Films, Inc.; |
| **"Lions Gate Distribution Agreement"** | the agreement dated as of December 1, 2018 and made between the Producer and the Lions Gate relating to the distribution and exploitation of the Rights in and to the Film in the Territory and any additional or replacement agreement; |
| **"Net Profits"** | has the meaning ascribed to the term in Schedule 5; |
| **"Other Guild Residuals"** | any and all residuals due any employees represented by a collective bargaining agreement, specifically excluding SAG, DGA, WGA and IATSE, but including, without limitation, AFM, the exact amounts to be notified in writing to FCAM by Producer; |
| **"Person"** | any of the Parties or the Beneficiaries or any other individual, entity, corporation, limited liability company or partnership; |
| **"Producer Expenses"** | any actual, out of pocket, documented, direct, third-party expenses to maintain the Producer in good standing with any applicable governmental authority, including, but not limited to, professional services and payment of taxes related thereto, capped at USD10,000, as applicable, except that there shall be no cap on actual, verifiable, direct, bona fide third party out of pocket governmental costs. The exact amount of Producer Expenses shall be |

from time to time advised to FCAM by Producer;

**"Rights"**     all copyright and similar rights of every kind and nature in any and all media, whether now known or hereafter devised in and to the Film and all exploitation, allied, ancillary or associated rights thereto (specifically excluding subsequent production rights, which are frozen, and music publishing rights, which are separately administered by BRON and Lions Gate) or in the underlying rights thereof, the proceeds from the exploitation of which are intended by the Parties to be collected and distributed pursuant to the terms hereof;

**"Statement"**     for each Accounting Period, a written statement in the Accounting Currency by FCAM specifying in the Accounting Currency the sources from which Collected Gross Receipts have been derived and their allocation to the Beneficiaries in accordance with their respective Entitlements in a form satisfactory to the Producer and consistent with Clause 4 of FCAM's Standard Terms of Agreement;

**"Talent Award Bonuses"**     as defined in the Lions Gate Distribution Agreement, which are box office and award bonuses payable to talent in the Film, of which fifty percent (50%) is payable by Producer;

**"Tax Credits"**     all tax credits, rebates or other film production tax incentives and the proceeds therefrom in connection with the Film;

**"Tax Credit Excess"**     Tax Credit Proceeds remaining, if any, following indefeasible repayment in full of the Tax Credit Lender Indebtedness, the exact amount to be notified to FCAM and Creative Wealth by the Tax Credit Lender;

| | |
|---|---|
| **"Tax Credit Lender"** | C&C; |

**"Tax Credit Lender Indebtedness"** all monetary obligations, contingent and otherwise, to Tax Credit Lender under the Tax Credit Lender Loan Agreement, including, without limitation, all interest thereon, and all fees, costs and expenses Producer is obligated to pay Tax Credit Lender thereunder, the exact amounts to be notified in writing to FCAM by Tax Credit Lender;

**"Tax Credit Lender Loan Agreement"** a loan and security agreement between the Tax Credit Lender and the Producer dated as of October 28, 2018, and all other agreements relating thereto, and any amendments, supplements, modifications, extensions, renewals or replacements to any of those agreements;

**"Tax Credit Lender Repayment Notice"** written notice from Tax Credit Lender to FCAM and copied to the Producer and Financier that the Tax Credit Lender Obligations have been paid in full;

**"Tax Credit Proceeds"** all refunds, subsidies, rebates or other amounts payable in connection with the Tax Credits;

**"Territory"** the universe; and

**"Third Party Participations"** all monetary obligations due cast and crew in the Film, not assumed by a Distributor, including, without limitation, Lions Gate, and paid by Producer.

1.1 Where the context so admits, words importing the singular shall include the plural and vice versa and words importing the neuter gender shall include the masculine or feminine gender and words importing individuals shall include firms and corporations.

1.2 References to Clauses and Schedules shall, save where otherwise expressly stated, be construed as references to the Clauses of and Schedules to this Agreement.

**SCHEDULE 3**

**Film Specification**

Title:                          "Bombshell"

Writers:                        Charles Randolph

Director:                       Jay Roach

Individual Producers:           A.J. Dix, Beth Kono, Charles Randolph, Margaret Riley, Jay
                                Roach, Aaron Gilbert, Robert Graf, Charlize Theron and Michelle
                                Graham

Principal Artist(s):            Margot Robbie, Charlize Theron, Nicole Kidman

Delivery Date:                  October 30, 2019

Budgeted Cost:                  USD37,997,901

# SCHEDULE 4

## Beneficiaries

- **FREEWAY CAM B.V.** (a company registered under the laws of The Netherlands at Herikerbergweg 238, Luna Arena, 1101CM, Amsterdam Zuidoost, Netherlands) (EU VAT identification number: NL810347647B01) c/o Andrássy út 12, 1061 Budapest, Hungary;

- **LUCITE DESK, LLC**, 345 North Maple Drive, Suite 294, Beverly Hills, CA 90210, United States of America, attention: Joel Guralnick, email: jguralnick@bronstudios.com;

- **BRON STUDIOS USA INC.**, 345 North Maple Drive, Suite 294, Beverly Hills, CA 90210, United States of America, attention: Joel Guralnick, email: jguralnick@bronstudios.com and collections@bronstudios.com;

- **CREATIVE WEALTH MEDIA FINANCE CORP.**, 151 Bloor Street West, Suite 700, Toronto, ON, M5S 1S4, Canada, attention: Jason Cloth, email: jason.cloth@cwmoviefund.ca;

- **CREATIVE WEALTH MEDIA LENDING LP 2016**, 151 Bloor Street West, Suite 700, Toronto, ON M5S 1S4, Canada, attention: Richard McConnell, email: richard.mcconnell@cwmoviefund.ca and Catharine Piccioli, email: Catharine.Piccioli@cwmoviefund.ca;

- **CAST & CREW FINANCIAL SERVICES, LLC**, 2300 Empire Avenue, 5th Floor, Burbank, CA 91504, United States of America, attention: Deirdre Owens, email: Deirdre.owens@castandcrew.com;

- **ANNAPURNA PRODUCTIONS, LLC**, 812 N. Robertson Boulevard, West Hollywood, CA 90069, United States of America, attention: Chris Corabi, email: chrisc@annapurnapics.com; and

- **PRESERVER LP**, 8700 Trail Lake Drive West, Suite 105 Memphis, TN 38125, United

States of America, attention: Dana L. Pointer, email dpointer@Preserverpartners.com, ("**Preserver**") represented by the Producer for the purposes of this Agreement.

The contact and bank account details of those Beneficiaries who are not Parties shall be provided to FCAM in writing by the Party representing the applicable Beneficiary (as stated above). FCAM may rely on the accuracy of the information provided to FCAM in writing by any such Party.



"Bombshell" – collection account management agreement



## SCHEDULE 6

## Irrevocable Instructions And Notice Of Acknowledgement

VIA FACSIMILE

Lions Gate Films Inc. 2700 Colorado Ave.

Santa Monica, CA 90404

USA

Attn: John Biondo

Lions Gate Films Inc. is hereby irrevocably instructed by Lucite Desk LLC ("Producer"), to pay all proceeds on the Film provisionally entitled "Bombshell" due and payable to Producer under the Distribution Agreement dated December 1, 2018 directly and without diversion or deduction, into the following Collection Account:

| | |
|---|---|
| Comerica Bank | ("CA Bank") |
| Bank Address: | 2000 Avenue of the Stars, 2nd Floor, Los Angeles, CA 90067 |
| ABA Routing No.: | 121 137 522 |
| SWIFT Code: | MNBDUS33 |
| Account Holder: | Stichting Freeway Custody |
| Subtitle: | Bank controlled account – Fair and Balanced |
| Account Number: | 1895009718; |

Please be further advised that this notice is coupled with an interest and is irrevocable and may not be modified or rescinded except in writing signed by Producer and Freeway CAM B.V. c/o Andrássy út 12, 1061 Budapest, Hungary ("FCAM") and Stichting Freeway Custody c/o Andrássy út 12, 1061 Budapest, Hungary. By your signature you agree to make payment only to the CA Bank, as directed above, and also to provide to FCAM copies of any and all statements and notices that accompany such payments or are otherwise created and delivered. You further agree to notify FCAM of any and all conflicting notices that might be received by you and of any claims by any third parties that such third party is entitled to receive all or any portion of any such payments.

"Bombshell" – collection account management agreement

Would you please acknowledge receipt and acceptance of this notice by signing this letter in the space below and returning it directly to FCAM at the above address with a copy to Producer.

Very truly yours,

LUCITE DESK LLC

By: _____

By: _____

AGREED AND ACKNOWLEDGED:

LIONS GATE FILMS INC.

By: _____

## FCAM'S STANDARD TERMS OF AGREEMENT

1. **Gross Receipts**

1.1    Producer and any Party owning or controlling any Rights (specifically excluding Lions Gate) hereby undertakes with FCAM and the other Parties hereto: (i) to issue the Irrevocable Instructions to Distributors in substantially the form contained in Schedule 6 to pay all Gross Receipts directly into the Collection Account, and (ii) to provide full accounting statements to FCAM together with such payments of Gross Receipts. The Producer shall insert the Collection Account into the Distribution Agreements.

-    insert into the Distribution Agreements irrevocable instructions to the Distributors in a form substantially similar to those contained in the Irrevocable Instructions; or

-    issue Irrevocable Instructions separately in substantially the same form as Schedule 6 to pay all Gross Receipts into the Collection Account.

1.2    The Producer shall undertake to promptly notify FCAM of delivery of the Film to the respective Distributor(s), and the Producer undertakes to promptly notify FCAM of delivery of the Film to the Distributors if relevant to payments, and, to the extent known, the respective release dates of the Film.

1.3    Except as otherwise specified in this Agreement, if any Party receives or, prior to the effectiveness of this Agreement, has received Gross Receipts itself (and not from FCAM in accordance with this Agreement), that Party will promptly inform FCAM who shall in turn notify the other Parties in writing of such receipt and simultaneously transfer such Gross Receipts into the Collection Account without deduction (other than any actual, verifiable and standard bank charges incurred in connection with such transfer) or set-off (unless expressly permitted hereunder). For the avoidance of doubt, regardless whether such Party transfers those Gross Receipts into the Collection Account, those Gross Receipts will be considered Deemed Collected Gross Receipts. In the event the Producer receives any Gross Receipts directly from Distributors, the Producer shall remit such monies to the Collection Account. Pending transfer of such Gross Receipts into the Collection Account such Parties shall hold such Gross

Receipts on trust for the benefit of the Beneficiaries and to be applied solely in accordance with the terms of this Agreement.

1.4     To enable FCAM to properly fulfil its obligations under this Agreement, Producer, AP and Creative Wealth, shall provide FCAM within five (5) Business Days) of such request, but no more frequently than quarterly, with any information reasonably required by FCAM, including but not limited to the following:

-       access to the statements of activity of the Collection Account, confirmation or clarification in connection with amounts received into the Collection Account, the source of such amounts, any debits or payments from the Collection Account, and

-       immediately following receipt of the Creative Wealth Repayment Notice, and the AP Repayment Notice, (but in each case within five (5) Business Days thereafter), written confirmation that Creative Wealth and AP have terminated any right to or control of the Collection Account or Gross Receipts.

## 2.      FCustody's and FCAM's Obligations

FCustody shall:

open and maintain the Collection Account and hold all Collected Gross Receipts in trust in the Collection Account for the benefit of the Beneficiaries to the extent of the Beneficiaries' respective Entitlements as specified in this Agreement. The Collection Account shall be a separate interest bearing trust account. No Collected Gross Receipts under this Agreement shall be crossed or commingled with any other proceeds arising from the exploitation of any other project. FCAM shall notify the Parties of FCAM's receipt of Collected Gross Receipts, if any.

FCAM shall:

2.1     immediately pay into the Collection Account, without set-off or deductions of any kind, any Gross Receipts directly received by FCAM from Distributors, the Producer or any

other Person and promptly notify the Parties upon receipt of any Gross Receipts by FCAM. Pending transfer of such Gross Receipts into the Collection Account, FCAM shall hold such Gross Receipts in trust for the benefit of the other Parties and to be applied solely in accordance with the terms of this Agreement;

2.2    provided FCAM has been given a copy of the relevant completed Distribution Agreement(s) monitor the dates upon which payments of Gross Receipts fall due to be paid to the Collection Account and if payments thereunder are timely not received FCAM may be requested by any of the Parties to request payment of the same from the relevant Distributor after consultation with the Producer;

2.3    ensure the Collected Gross Receipts earn interest at the most favourable rate available at the CA Bank or wherever the Collection Account may be held for similar accounts and amounts and periods for which funds are set on deposit with the CA Bank as agreed among the Parties;

2.4    notify the Parties of FCAM's receipt of Collected Gross Receipts and advise all Parties upon request of the Producer or any if payments of Gross Receipts due under the said Distribution Agreement have not been received;

2.5    convert Collected Gross Receipts received in a currency other than the Accounting Currency into the Accounting Currency at the exchange rate prevailing on the day of such conversion (being the date on which such Collected Gross Receipts are received into the Collection Account) and keep a record of such rate;

2.6    calculate, pay and distribute the amount of Collected Gross Receipts payable to each Beneficiary and pay and distribute Collected Gross Receipts to all Beneficiaries in the manner, amounts and order set out in Schedules 5;

2.7    on written request provide any Party with copies of statements and/or accounts received by FCAM from the Producer, or Distributors and it is hereby confirmed that the Producer request to be provided with copies of such statements and/or accounts;

2.8    pay out Entitlements in the Accounting Currency, unless otherwise specified in this Agreement or if FCAM is timely notified in writing otherwise by a relevant Party. In case

FCAM is instructed to pay out any Entitlement in a currency other than the Accounting Currency, the Entitlement will be converted into the requested currency, at the exchange rate prevailing at the time of such conversion and the Collection Account shall be debited with the counter-value in the Accounting Currency at the expense of the requesting Party. For the avoidance of doubt, Entitlements which are being paid in full or in part in a currency which is not the Accounting Currency, shall be reported in Statements as being the sums of amounts (in the Accounting Currency) actually debited from the Collection Account;

2.9     provide Producer and Creative Wealth with such information as Producer and Creative Wealth shall request, promptly following such request;

2.10    FCAM and FCustody hereby make the following representations and warranties:

2.10.1  FCAM and FCustody are organisations duly organised, validly existing and in good standing under the laws of the Netherlands and have all requisite corporate power and authority to enter into this Agreement and to carry out the terms hereof;

2.10.2  all corporate and other actions and proceedings required to be taken to authorise the execution, delivery, and consummation of this Agreement by FCAM and FCustody have been or will be taken;

2.10.3  FCAM and FCustody have the absolute right to enter into, to execute and deliver this Agreement, and to perform their obligations hereunder;

2.10.4  this Agreement constitutes valid and binding obligations of FCAM and FCustody enforceable in accordance with its terms;

2.10.5  FCAM and FCustody do not require the consent or approval of any other Person to enter into and perform this Agreement;

2.10.6  the execution and delivery of this Agreement is not, and the performance of this Agreement will not, constitute or result in: (a) a breach or violation of any provisions of the articles of incorporation, bylaws or minutes of FCAM and FCustody or any amendment thereto; (b) a material breach of any of the material terms, conditions or

provisions of, or a default under, any agreement, instrument, understanding, indenture, mortgage, deed of trust, credit arrangement, note, evidence of indebtedness or other document to which FCAM and FCustody are a party or by which they or their properties are bound; (c) to the best of FCAM's and FCustody's knowledge, following due inquiry, a violation of any statute, decree, judgment, rule, regulation or writ or other order of any court of federal, state, county, municipal, regulatory or governmental authority, board, body or agency; (d) to the best of FCAM's and FCustody's knowledge, an act of bankruptcy, preference, insolvency, or fraudulent conveyance under any bankruptcy act or other law for the protection of debtors and/or creditors in any applicable jurisdiction or (e) there are no threatened or actual claims, causes of action or disputes which would in any way affect FCAM's and/or FCustody's ability to fulfil their obligations under this Agreement;

2.10.7  FCAM and FCustody shall not change their business or organizational objectives during the term of this Agreement without first providing sixty (60) days written notice to the Parties to this Agreement;

2.10.8  neither FCAM nor FCustody have charged, pledged or otherwise encumbered their respective undertakings or assets (including the Collection Account or the monies standing to the credit of the Collection Account and their respective rights and benefits under this Agreement), by any lien, attachment, pledge, charge, deposit account control agreement or any similar legal instrument except for any security interests acknowledged by all Parties and identified in this Agreement;

2.10.9  neither FCAM nor FCustody has or shall encumber or mortgage the Collection Account or the monies standing to the credit of the Collection Account or any of the Collected Gross Receipts; except for any security interests acknowledged by all Parties and identified in this Agreement; and there are no threatened or actual claims, causes of action or disputes which would in any way affect FCAM's and FCustody's ability to fulfill all of their obligations under this Agreement.

2.11  FCAM and FCustody each warrants and undertakes to the other Parties that FCAM and FCustody has no interest in the funds from time to time standing to the credit of the Collection Account (save for FCAM's right to FCAM's Remuneration and the FCAM Expenses) and shall not exercise any right of set-off, counterclaim, defense, cross

collateralization or anything analogous thereto against such funds. The Collected Gross Receipts (together with any interest earned thereon) shall be deemed to be the property of the Beneficiaries in accordance with their respective Entitlements, from time to time.

## 3. Distribution of Collected Gross Receipts

3.1 FCAM shall commence distribution of Collected Gross Receipts from the Collection Account from the last date of the month during which Gross Receipts are first credited to the Collection Account and then monthly thereafter for the first 24 months and quarterly thereafter for the next 24 months. Thereafter, FCAM shall distribute Collected Gross Receipts from the Collection Account on a semi-annual basis;

3.2 FCAM shall not be obliged to prepare Statements to the Parties and make disbursements from the Collection Account unless at least one Beneficiary is entitled to be paid more than USD500 and to remit Entitlements to any Beneficiary unless such Beneficiary is entitled to be paid not less than USD500 PROVIDED THAT in any event FCAM shall prepare Statements and remit all Entitlements to any Beneficiary on a semi-annual basis regardless of amounts;

3.3 This Agreement and all receipts, allocations and payments of Collected Gross Receipts hereunder by FCAM shall be subject to the requirements of all applicable present and future laws, regulations or directives including any and all withholding taxes or other taxes or duties, levies, fees or charges imposed by any international, national, multi-national, federal, state, local or other governmental or quasi-governmental authority ("**Amounts Due**") and the provisions of this Agreement shall be curtailed and limited to the extent necessary to comply with such requirements such that FCAM has no obligation to make any payment of Amounts Due to a Beneficiary if such payment would be unlawful in a jurisdiction to which FCAM is subject under this Agreement or under applicable law, provided that (i) FCAM provides prior written notice to such Beneficiary that it intends to withhold any Amounts Due, (ii) FCAM segregates the Amounts Due and agrees not to pay such monies to any other Party, including any Party or Beneficiary under this Agreement or otherwise, unless FCAM is required to do so in order to comply with laws, regulations or directives ("Adverse Order"); provided, however, in no event may FCAM pay such Amounts Due pursuant to an Adverse Order

unless (a) FCAM has promptly notified such Beneficiary of the Adverse Order, (b) at the request and cost of the applicable Beneficiary, FCAM provides to that applicable Beneficiary a legal opinion from reputable law firm opining that payment of the Amounts Due pursuant to the Adverse Order is absolute and necessary under applicable laws, regulations or directives, (c) the Beneficiary has had an opportunity to either (x) interplead the Amounts Due pursuant to the Adverse Order for final determination by a court of competent jurisdiction in the State of California or other applicable law of the proper disposition of such funds, (y) seek a court order to restrain FCAM from paying such Amounts Due, or (z) agree to payment of the Amounts Due pursuant to the Adverse Order;

3.4     The Parties agree that FCAM has the right to, with respect to any Beneficiary, create a reasonable reserve for Amounts Due applicable to such Beneficiary from Collected Gross Receipts or Entitlements payable to such Beneficiary subject to prior consultation with such Beneficiary with respect to such reserve amount and provided such reserved amounts are only paid pursuant to the provisions of this Clause 3.3. Such reserve shall subsequently be liquidated on the basis of good faith negotiations between the affected Beneficiaries and FCAM but in no event shall be later than sixty (60) days after the establishment of such reserve. In absence of material breach, gross negligence or wilful misconduct of FCAM, FCAM has no liability in respect of any decision taken and executed under this Clause 3.3. In addition, FCAM has the right to request and require any Beneficiary to provide FCAM with any Distribution Agreement to which it is a party, any legally required and executed tax documents, any tax forms, certifications, supporting materials including any licences, any underlying agreements regarding the Film, including but not limited to any agreements for the provision of services, financing, and any other items reasonably requested by FCAM. The Parties agree that FCAM has the right to make any legally required tax withholding(s) and any other legally required deductions or retentions from any sums payable to any Beneficiary and may without any liability to any Party (or alternatively create a reasonable reserve from Collected Gross Receipts such reserve to be liquidated no later than six (6) months from its creation to) make any deposits, payment or other transfer of any such sums to any governmental or quasi- governmental authority;

3.5     Intentionally Deleted; and

3.6    FCAM shall not be obliged to make any payment out of Collected Gross Receipts if and to the extent that the making of such payment would constitute a breach of any court order or would otherwise be unlawful, provided that, FCAM will provide the Parties with prompt written notice of the same and shall take all reasonable steps in order to find alternative solutions which may enable FCAM to resume making payments to the Beneficiaries as provided for hereunder and that FCAM supplies the Parties with prompt written notice of and supplies written evidence of such court order or legal notice explaining such unlawful activity. FCAM shall continue to disburse all Collected Gross Receipts that do not breach any court order or are not otherwise illegal.

**4.    Accounting**

4.1    For the first twenty-four (24) months after the last date of the month during which Gross Receipts are first credited to the Collection Account, in respect of each calendar month during which Gross Receipts are credited to the Collection Account, FCAM shall provide the Parties with a Statement within fifteen (15) Business Days of the end of each calendar month to which it relates;

4.2    From the twenty-fifth (25th) month after the last date of the month during which Gross Receipts are first credited to the Collection Account for a period of twenty-four (24) months, FCAM shall provide the Parties with a Statement on a quarterly basis, within fifteen (15) Business Days of the end of each quarter to which it relates;

4.3    Thereafter, until termination of this Agreement, FCAM shall provide the Parties with Statements on a semi-annual basis within fifteen (15) Business Days of the end of each semi-annual period. Notwithstanding anything herein to the contrary, as of such time when FCAM shall only have a quarterly or semi-annual reporting duty, FCAM shall provide a Statement within one quarter if Collected Gross Receipts of at least USD15,000 in the aggregate are received in the Collection Account or, upon the request of the Producer, if the Collected Gross Receipts of at least USD15,000 in the aggregate are received by it;

4.4    The content as well as the form of the first draft Statement only is subject to the approval by all Parties, which approval shall be deemed given unless FCAM has received a written notification to the contrary (which notification is to be sent by email)

from one or more of the Parties within five (5) Business Days after receipt of such draft Statement.  In the event any of the Parties disapproves the content and/or the form of the first Statement, FCAM shall as soon as reasonably possible re- issue the first draft Statement to all Parties. Then, as of the moment the first draft Statement has been re-issued by FCAM, the approval by all Parties of the draft first Statement shall be deemed given unless FCAM has received a written notification to the contrary from one or more of the Parties within five (5) Business Days after receipt of such draft Statement. In any event, all Parties jointly have the right to approve the first draft Statement before the deadlines set out above;

4.5     Intentionally Deleted;

4.6     Intentionally Deleted;

4.7     FCAM will pay the Entitlements by wire transfer simultaneously with or within five (5) Business Days from the issuance of a Statement. FCAM may only distribute to itself that part of Collected Gross Receipts due to it under Item 1 of Schedule 5 at the same time as it disburses to Beneficiaries distributions for Entitlements as required by this Clause 4.7;

4.8     FCAM shall at all times keep at its principal place of business as reflected on the front page of this Agreement (which location shall not be changed without prior written notice to each Party) complete and accurate books of account and records relating to all monies received in and paid from the Collection Account;

4.9     Any Party hereto, whether or not using its own independent auditors, shall have the right on giving prior reasonable notice no more than once in any twelve (12) month period to inspect, copy and audit the books and accounts of FCAM in relation to the Film at its office and such audit shall be at the expense of the requesting Party unless such audit reveals an error of the greater of five percent (5%) or USD5,000 against the interests of the requesting Party, in which case FCAM shall pay the reasonable costs of such audit and any outstanding balance revealed to be payable by such audit which costs shall not form part of the FCAM Expenses for the purposes of this Agreement and shall not in any way be reduced or deducted from Collected Gross Receipts and/or any outstanding balance revealed to be payable by such audit, and FCAM shall make good

any underpayments revealed by way of the audit from existing and future Collected Gross Receipts or within a period of three (3) months from the date of such error, from its own resources if there are insufficient Collected Gross Receipts. This right of audit shall continue for a period of three (3) years following the expiration or termination of this Agreement;

4.10 Provided FCAM and/or FCustody properly distributes Collected Gross Receipts in accordance with the terms of this Agreement, no liability shall attach to FCAM and/or FCustody on account of their application of any sums received by FCAM under this Agreement or for any other obligations on the part of FCAM and/or FCustody under this Agreement save as provided for by Clause 4.9 above or in the event of fraud, material breach, dishonesty, gross negligence or wilful misconduct on the part of FCAM and/or FCustody. FCAM will make good any underpayments on its part provided that a claim has been lodged in writing with FCAM within 20 Business Days after the date of payment to which such claim relates. Notwithstanding the above but without prejudice to Clause 4.9, if an erroneous payment (i.e., a payment that is not in accordance with the Statement as provided to the Parties for the relevant Accounting Period) is discovered after the aforementioned 20 Business Days period has elapsed, FCAM shall apply existing and future Collected Gross Receipts (if any) to correct any underpayment suffered or overpayment received by any Party as a result of such erroneous payment in accordance with Clause 5.3 below. The Parties hereby agree and acknowledge that, in the event that existing and future Collected Gross Receipts are insufficient to correct any underpayment, subject to Clause 4.9, any underpaid Party's recourse shall be against the overpaid Party or Parties (or Beneficiaries) and not (in the absence of any fraud, material breach, gross negligence or wilful misconduct on the part of FCAM and/or FCustody) against FCAM and/or FCustody unless it is FCAM and/or FCustody that has received such overpayment. Notwithstanding anything to the contrary in this Agreement, to the extent such claim is made by the Parties due to fraud, material breach, gross negligence or wilful misconduct on the part of FCAM, the twenty (20) Business Days period shall not apply; and

4.11 Notwithstanding the foregoing, FCAM shall indemnify, defend and hold harmless the Party(ies) with respect to any liability, loss, damage, cost or expense, including reasonable outside (legal) counsel's fees, reasonable (legal) counsel's costs or court or arbitration costs (but excluding consequential damages and loss profits), arising

directly from material breach, gross negligence or wilful misconduct on the part of FCAM; provided, however, FCAM's foregoing agreement to indemnify, defend and hold harmless the Party(ies) applies so long as such liabilities, losses, damages, costs or expenses were not caused by the Party's(ies') material breach, wilful misconduct or gross negligence.

**5.     Obligations of the Parties**

Each of the Parties agrees severally and for itself with FCAM, FCustody and with the other Parties:

5.1     Except as otherwise permitted herein, that they will not during the term of this Agreement authorize or permit any third party to collect or administer Gross Receipts nor will any Party interfere with, frustrate or take any action contrary to the terms of this Agreement without prejudice to any Party's respective rights and remedies (at law or in equity) as a secured party in connection with the Film;

5.2     The Producer shall provide FCAM promptly, upon FCAM's request, with copies of all Distribution Agreements and each of the other Parties (insofar as each Party is able) shall provide FCAM with all other relevant agreements, notices of assignment, Irrevocable Instructions or other information FCAM may reasonably request in order to perform its obligations under this Agreement. FCAM agrees to maintain the confidentiality of any such documents that are confidential in nature. Any information provided after the deadline specified in Clause 4.7 shall be taken into account for the preparation of the Statement for the subsequent Accounting Period;

5.3     that if any Beneficiary receives a disbursement of Collected Gross Receipts hereunder in excess of its Entitlement or if withholding tax on disbursed Collected Gross Receipts has to be refunded, the relevant Beneficiary, if also a Party, shall immediately repay such amount into the Collection Account and all Parties shall (to the extent such Beneficiary is contracted with such Party) cause any Beneficiary not being a Party to perform the same. If any such sum is not repaid by the relevant Beneficiary (if also a Party) within five (5) Business Days of written notification by FCAM, FCAM shall not be obligated to make any further payments to such Beneficiary until the amount due has been either deducted from the next Entitlement (if any) of the Beneficiary

concerned or repaid in full;

5.4     that FCAM and/or FCustody shall not be required to incur any third party, out of pocket expense under this Agreement on their account other than the expense of performing its obligations hereunder, nor to make any payment to any Beneficiary save from Collected Gross Receipts, except as stipulated in Clause 4.9 or to the extent such expense arises out of any material breach of this Agreement by FCAM and/or FCustody or fraud, gross negligence or wilful misconduct on the part of FCAM and/or FCustody;

5.5     to the extent within such Party's possession and control, to provide FCAM prior to the issuance of the first Statement with the following information (to the extent not already provided in this Agreement) and such further information as FCAM may reasonably require in order to discharge its obligations under this Agreement:

    5.5.1   names and addresses of all Beneficiaries as well as W-8 and W-9 tax forms, if applicable, to be arranged by the Producer unless supplied by the relevant Beneficiary;

    5.5.2   fees, commissions and incurred expenses of the Producer; and

    5.5.3   procedure for approval of the Producer's expenses and of the expenses payable to any other Person;

5.6     that excluding FCAM and FCustody, the Parties shall indemnify in a joint and several manner (but only to the extent of and pro rata to their respective Entitlements) FCAM and FCustody and agree to hold FCAM and FCustody safe, harmless, defended and indemnified against any third party liabilities, losses, damages, costs or expenses (including reasonable, outside legal fees and costs and directly incurred arbitration fees and costs) but excluding lost profits ("Liability Costs") directly incurred by reason of any claim, action or proceeding arising out of or in connection with FCAM's and FCustody's acceptance of or performance under this Agreement (including third party claims and the reasonable costs of any outside legal advice taken by FCAM and FCustody pursuant to Clause 7) except for any claim that would otherwise be covered by FCAM's indemnity herein and except for cases of fraud, material breach, gross negligence or wilful misconduct. In no event will FCAM withhold payment due to a Party because another Party has failed to make a payment to FCAM under this provision;

provided further that FCAM supplies verifiable evidence of such Liability Costs. if it is determined that the claim is the result of FCAM being or having been in material breach, wilful misconduct or gross negligence under this Agreement, then FCAM shall not be entitled to any relief, including, without limitation, to be paid any sums by the Parties under this Clause 5.6 arising from such claim;

5.7     that the Parties shall not put any lien, charge or any similar legal instrument over the Collection Account or the Collected Gross Receipts or any other monies standing to the credit of the Collection Account, except for the security interest pursuant to Clause 5.8, any security interests acknowledged by all Parties and identified in this Agreement;

5.8     to the extent for whatever reason that the trust created by this Agreement in favour of the Beneficiaries is ineffective or otherwise held to be invalid with the result that FCAM and/or FCustody is deemed beneficially entitled in any way to the monies standing to the credit of the Collection Account then each of the Parties is hereby granted by FCAM and FCustody a security interest over the Collection Account and the Collected Gross Receipts held therein from time to time, solely to the extent of its Entitlement thereto and solely to secure such Party's right to receive its Entitlement pursuant to the terms hereof;

5.9     neither FCAM nor FCustody has any interest in the funds from time to time standing to the credit of the Collection Account (save for FCAM's right to FCAM's Remuneration and the FCAM Expenses) and neither shall exercise any right of set-off, counterclaim, defense, cross collateralization or anything analogous thereto against such funds. As a result of the trust created by FCustody in favour of the Beneficiaries over the Collection Account and all monies standing to the credit of the Collection Account from time to time, the Collected Gross Receipts (together with any interest earned thereon) shall be deemed to be the property of the Beneficiaries in accordance with their respective Entitlements from time to time and FCAM shall hold all funds from time to time standing to the credit of the Collection Account on trust for the Beneficiaries in accordance with their respective Entitlements from time to time. It is understood and agreed that funds are not the property of FCAM or FCustody nor subject to any liquidation, bankruptcy, restructuring or similar proceeding or any action of FCAM or FCustody or their owners, successors, employees, representatives or designees not authorized hereunder; and

5.10 All Parties represent and warrant that no accounts into which Gross Receipts are deposited shall be governed by a deposit account control agreement.

## 6. General

6.1 Except in the case of manifest or obvious error, in the performance of its duties and exercise of its powers under this Agreement, FCAM will be entitled to rely upon any document reasonably believed by FCAM to be genuine and to have been sent or signed by the Person by whom it purports to have been sent or signed and the opinion and statements of any professional advisor selected by FCAM in connection herewith and shall not be liable to any Party for any consequence of any such reliance or related assumption and/or action absent gross negligence, material breach, and/or wilful misconduct. FCAM shall promptly provide to the Parties copies of any such documents to the extent it relates to the disbursement of Collected Gross Receipts or the performance of FCAM's duties under this Agreement;

6.2 Without limiting any of its obligations hereunder or under any applicable laws, FCAM and FCustody shall have no duties or obligations pursuant to this Agreement save as expressly set forth herein which includes, but is not limited to, a fiduciary duty to act with reasonable care taking into account the interests of the Beneficiaries in the performance of their obligations hereunder and in good faith at all times;

6.3 In the event that FCAM is in reasonable doubt about or unable to carry out the allocation, accounting or payment of Entitlement(s), or conflicting demands are made, or conflicting instructions or information are given from any Parties, FCAM may retain such Entitlements (the "**Reasonable Doubt Entitlements**") in the Collection Account and FCAM shall not be obligated to make any further payments as regards to the amount(s) of the Reasonable Doubt Entitlements to the Beneficiary(ies), until such uncertainty has been resolved. FCAM shall immediately notify the Parties upon the occurrence of such event as well the details of such Reasonable Doubt Entitlements, including what information it requires. If such information is not provided within thirty (30) calendar days after the Beneficiaries' receipt of such written notification, then FCAM shall be permitted to make such calculations in its best reasonable judgment, and distributions of Entitlements, in accordance thereto, to the Beneficiaries, other than

to the Beneficiaries for which information is lacking, subject to FCAM maintaining a reserve for Entitlements otherwise due to the Beneficiaries for which information is lacking, which reserve shall be liquidated after six (6) months by allocating such reserve to the Entitlements of the Beneficiaries, other than the Beneficiaries for which information is lacking, if the information being sought is not provided to FCAM within the aforesaid 6 month period. In absence of material breach (and for the avoidance of doubt, any decision or action performed in accordance with this Clause 6.3 shall not be deemed a material breach), gross negligence or wilful misconduct, FCAM has no liability in respect of any decision taken and executed;

6.4     If FCAM is unable for reasons outside its control which events constitute a force majeure condition to all other companies carrying on similar functions, to carry out any of the provisions hereof, FCAM shall notify the Parties in writing of the same and the specific reasons therefor as soon as reasonably practicable and FCAM shall incur no liability as a consequence thereof for so long as the relevant situation continues and during such period FCAM shall have no responsibility for its inability to carry out or perform the relevant provisions hereof, provided that FCAM shall promptly notify the Parties in writing of such events and provide sufficient details. In such event, FCAM shall hold any Entitlement which it is unable to make payment on until such time that payment may be released to the Beneficiaries. If any such event continues for more than three (3) consecutive months, the Parties collectively may decide to terminate this Agreement. However, the foregoing does not prejudice the right of the Parties to terminate this Agreement in accordance with Clause 9 hereof;

6.5     If FCAM is unable at any time to make payments out of Collected Gross Receipts by reason of the failure of the Parties (or Beneficiaries) to provide any information required by FCAM, FCAM shall notify the Parties (or Beneficiaries) of the same in writing as soon as is reasonably practical and shall not be obligated to make any further payments to any Beneficiary until such time as any Party (or Beneficiary) hereto shall have provided sufficient information to FCAM in order to make such payments provided that FCAM shall promptly make written request for such information from such Party or Beneficiary. In the event that the failure of providing information to FCAM only affects the Entitlements of certain Beneficiaries, FCAM shall pay any other Entitlement to any other Beneficiary in accordance with Schedules 5;

6.6    FCAM shall have no obligation to protect the copyright or any similar rights in or to the Film in any part of the world whether by registration or otherwise;

6.7    Notwithstanding anything to the contrary of the provisions contained in Clause 6.11, if claims conflicting with the reasonable, good faith interpretation of the terms of this Agreement are notified in writing to FCAM by any Party relating to the Collection Account or the Collected Gross Receipts, or if any third party should assert claims in respect thereof, FCAM shall be entitled, at FCAM's reasonable discretion and after notifying the Parties hereto in writing of such claims, to:

6.7.1    notwithstanding any other provision herein contained, upon prior written notice to all the Parties, suspend the disbursement of the affected portion of Collected Gross Receipts without liability to any Party until any conflict is in the reasonable opinion of FCAM resolved, provided that FCAM has notified all Parties of such suspension; and/or

6.7.2    invoke the arbitration procedure referred to in Clause 8 hereof within a reasonable time;

6.8    Provided that FCAM is not in material breach of any of its obligations hereunder, FCAM shall not be obligated to take any action under this Agreement which may in FCAM's reasonable opinion involve any expense or liability on FCAM's part other than (but only if such action does not arise from any material breach by FCAM of its obligations hereunder) those expenses which are incidental to FCAM's or FCustody's compliance with their obligations under Clause 2, 3 or 5 of this Agreement unless FCAM shall have first been furnished with an indemnity from the Parties in a form acceptable to FCAM. Any expense incurred by FCAM pursuant to this Clause 6.8 shall be deemed FCAM Expenses for the purposes of this Agreement (but only if such expense was not incurred as a result of any material breach by FCAM of its obligations hereunder);

6.9    FCAM shall be entitled without liability to engage in its normal and customary business with any Beneficiary or any affiliate or associate of any Beneficiary provided that nothing in this Clause shall affect the right of the Beneficiaries to receive their Entitlements in accordance with the terms of this Agreement;

6.10    If any act or payment by FCAM is subject to the approval of one or more of the Parties,

and such approval or an explicit objection has not been received in writing by FCAM within 7 Business Days after receipt of a request for the same in writing, such Party shall be deemed to have given its approval to the relevant act or payment and FCAM shall be entitled to perform the relevant act, make the relevant payment or otherwise act in accordance with the terms and conditions of this Agreement. If FCAM receives a notice from any Party informing it that any other Party has been paid in full or directing it to take any action contrary to the terms set forth herein, FCAM shall immediately provide a copy of such notice to all Parties and wait five (5) Business Days prior to taking any action on such notice. If no confirmation or consent is received from the affected Party(ies), then FCAM will proceed according to the terms of this Agreement;

6.11    Subject to Clause 6.12 below, this Agreement shall be deemed to be the principal document among the Parties relating to the distribution of the Collected Gross Receipts;

6.12    In the event of any conflict between the provisions of this Agreement and the provisions of any other document among the Parties relating to the Film with respect to the collection of Gross Receipts and the disbursement of Collected Gross Receipts and the respective Parties' Entitlements, the provisions of this Agreement shall prevail;

6.13    So long as FCAM and FCustody are not in material breach hereof, the Producer shall use its reasonable endeavours to accord the following credit on all copies of the Film in the form "World revenues collected and distributed by Freeway CAM B.V."; provided that, any failure to provide FCAM with such credit will not be a breach hereof and will not entitle FCAM to bring any action whether by way of injunctive or other similar equitable relief or in contract or damages and FCAM hereby expressly waives its right to bring any such action;

6.14    The Parties severally agree with each of the others that the terms of Schedule 5 of this Agreement are confidential to the Parties and shall not be disclosed to any third party, save that any Party shall be entitled to reveal such terms to its professional advisors, any assignee and its respective professional advisors, any governmental or regulatory authority and as required by law or judicial proceeding, to any Beneficiary in relation to matters which affect such Beneficiary;

6.15 The Parties hereto agree and declare that the provisions of the United Kingdom Contracts (Rights of Third Parties) Act 1999 (or any similar provision in any other relevant jurisdiction) shall not apply to this Agreement and that no term or condition of this Agreement shall confer or be construed as conferring any right on any third party;

6.16 The clause and paragraph headings in this Agreement are provided for convenience only and shall not affect the construction, interpretation or effect of this Agreement;

6.17 Nothing herein shall constitute a partnership or joint venture between the Parties hereto or any two or more of them;

6.18 FCAM may not assign or delegate any of its rights or obligations under this Agreement without the prior written approval of all of the other Parties. Any Beneficiary may assign, or designate any other Person(s) to receive, such Beneficiary's Entitlements hereunder at any time by providing FCAM with written notice thereof and an instruction to pay such assignee(s) or designee(s). In addition, if prior written approval of all the other Parties is not given to FCAM for assigning or delegating its rights or obligations as set forth above, FCAM agrees to indemnify any Beneficiary for any liability, loss, damage, cost or expense, including reasonable outside (legal) counsel's fees, reasonable (legal) counsel's costs or court or arbitration costs (but excluding consequential damages and loss profits), arising directly from any assignment of FCAM of its rights and/or obligations under this Agreement;

6.19 If FCAM may or is to receive a joint notification from two or more of the Parties hereto that one or more of such Parties has gone into administration, receivership, liquidation or any applicable or equivalent process in such Party's particular jurisdiction ("**Bankrupt Party**"), the notification may be done by the other Party or Parties who are to notify FCAM (but not the Bankrupt Party), to the extent this is permitted by the applicable law of the Bankrupt Party, otherwise, if a Party must be represented by a liquidator, administrator, receiver or other external administrator appointed to that Party's assets or business (jointly "**Administrator**"), the Administrator is entitled to represent the Bankrupt Party and give joint instructions and reply on behalf of the Bankrupt Party. However, if such Administrator does not reply on behalf of the Bankrupt Party within ten (10) Business Days (or if known to the Parties, within the deadline applicable to the proceedings of the Administrator under relevant legislation) after a written request for a notification (such

time being specified in the notice to the Administrator) then FCAM shall send a second written request to the Administrator. If the Administrator does not reply on behalf of the Bankrupt Party within a further ten (10) Business Days (or if known to the Parties, within the deadline applicable to the proceedings of the Administrator under relevant legislation) after such second written request (such time being specified in such second notice to the Administrator) then, subject to applicable bankruptcy law, the Administrator's failure to respond within the requisite time period will mean "deemed acceptance" and the other Parties may, but shall not be obligated to, proceed without the Administrator's involvement in relation to that specific issue only; and

6.20   All Parties acknowledge and agree that at any time that Creative Wealth shall have assigned all or any portion of its rights and obligations under the Creative Wealth Loan Agreement to any other party for whom Creative Wealth is already or will be acting as agent thereunder, Creative Wealth shall continue to be a Party to and a Beneficiary of this Agreement, and shall be a Party to and Beneficiary of this Agreement as agent for the holders from time to time of the rights and obligations under the Creative Wealth Loan Agreement originally held by Creative Wealth, including Creative Wealth to the extent of its continuing interests under the Creative Wealth Loan Agreement.

## 7.   Legal Advice

7.1   FCAM may at any time and in its reasonable discretion (with the prior written approval of each of the Parties providing an indemnity or an agreement to pay) seek independent legal advice with regard to any non-payment of Gross Receipts by any Distributor or to any other matter relating to or affecting the performance of FCAM's duties or powers set out in this Agreement (but not, unless approved by the other Parties, in respect of any default by any Distributor) and each Party hereby undertakes to assist FCAM to obtain as fully informed and accurate legal advice as possible by, on request of FCAM:

7.1.1   providing FCAM with copies of any relevant document in the possession of that Party unless the provision of such document would cause the Party to breach an obligation of confidentiality;

7.1.2   taking all reasonable steps to procure that copies of any relevant documents

that have been but are no longer in that Party's possession are provided to FCAM; and

7.1.3   informing FCAM of any relevant information in the knowledge of that Party or (if appropriate) in the knowledge of its officers servants and/or agents;

7.2   FCAM shall consult with each Party in a reasonable and timely manner in advance of obtaining written approval from the Parties with respect to legal advice set out in Clause 7.1 above, and FCAM shall provide to each of the Parties a copy of any legal advice so obtained;

7.3   The Parties (excluding FCAM and FCustody) jointly and severally (but only to the extent of and pro rata to their respective Entitlements) indemnify FCAM against all actual, reasonable, out of pocket, third party verifiable costs charges and expenses connected with or directly arising out of obtaining any such pre-approved legal advice and such pre-approved costs charges and expenses shall be deemed to be FCAM Expenses for which FCAM is entitled to be reimbursed in accordance with Schedule 5. If at any time FCAM shall determine that the amount of Collected Gross Receipts then standing credited to the Collection Account is not sufficient to discharge such costs charges and expenses as are to be or have been incurred by FCAM the Parties (excepting FCAM and FCustody) shall forthwith pay to FCAM the amount of any such shortfall or the estimated amount thereof and shall be jointly and severally (but only to the extent of and pro rata to the Parties' respective Entitlements) responsible therefore. In no event will FCAM withhold payment due to a Party because another Party has failed to make a payment to FCAM under this provision; and

7.4   Any sums paid by the Parties to FCAM pursuant to Clause 7.3 shall (notwithstanding the provisions of Schedule 5) be repaid to the Parties in first position out of Collected Gross Receipts in accordance with Schedule 5.

## 8.   Arbitration

8.1   Should any dispute arise between any two or more of the Parties with respect to this Agreement, the dispute shall be resolved by arbitration in the Forum under the rules

then in force for IFTA subject to the provisions of this Clause 8;

8.2     FCAM shall provide the Parties with a written notice summarizing the dispute and the relevant Parties shall within ten (10) Business Days after such notification mutually appoint at their own expense a single IFTA approved arbitrator (who must be an expert on the motion picture industry and the legal aspects thereof). If the Parties fail to agree upon the appointment of an arbitrator within such period, the arbitral agent of IFTA will then appoint an arbitrator or as soon as possible after such application. The Parties shall provide the arbitrator with all non-privileged relevant information and documentation within thirty (30) days of the appointment and the arbitration shall commence at a location in the Forum as expeditiously as possible and in any event within thirty (30) Business Days after the appointment of the arbitrator;

8.3     After a decision by the arbitrator, FCAM shall promptly provide a copy of such award to each of the other Parties and the Parties shall forthwith comply with that decision in accordance with the terms thereof;

8.4     Except if due to FCAM's gross negligence, material breach or wilful misconduct, all reasonable, direct, actual verifiable, third party out-of-pocket costs, charges and expenses actually incurred by FCAM in relation to the resolution of the dispute, shall be deemed FCAM Expenses, provided that if FCAM itself is a party to the arbitration proceedings, the payment of any costs incurred by FCAM shall be subject to any award of costs made by the arbitrator;

8.5     Upon conclusion of the arbitration proceedings, the arbitrator shall immediately render and issue a written decision. Any judgement upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof and any court having jurisdiction may enforce such decision.Each of the Parties hereto submits to the non-exclusive jurisdiction of the courts of the state and county of the Forum, as an appropriate place for compelling an arbitration or giving legal confirmation of the any arbitration award and irrevocably waives any objection which it may now or hereafter have to the venue of any such enforcement proceeding brought in any said courts and any claim of inconvenient forum. Each of the Parties hereto agrees to accept service of process for any judicial or other proceedings in the manner provided in Clause 8, hereof and such service shall be deemed effective as provided therein. Each of the Parties expressly

waives application of the procedures of service of process pursuant to the Hague Convention for the Service Board of the Judicial and Extrajudicial Documents in Civil and Commercial Matters; and

8.6     FCAM shall only be involved as an arbitration party if the dispute being the subject of the arbitration relates to FCAM's performance of its duties under this Agreement.  Upon receipt of an arbitration notice, FCAM shall cease to pay any disputed Entitlement until the earlier of either (1) the arbitrator has notified FCAM in writing of its award, (2) the arbitration parties have each provided FCAM with a copy of the arbitrator's award or a joint notification that the arbitration was abandoned, or (3) the arbitration parties provide mutual written instructions to FCAM regarding the disputed Entitlements.

## 9.     Termination

9.1     FCAM and FCustody may at any time after the date falling three (3) years after the date of this Agreement request to terminate this Agreement at no cost to the Parties upon sixty (60) Business Days by written notice to all of the Parties provided that FCAM's and FCustody's notice shall specify the arrangements proposed to be made by FCAM and FCustody to pay Entitlements which, apart from such termination, would then have been payable to Beneficiaries under the provisions hereof and FCAM and FCustody shall give good faith consideration to any representations made to FCAM and FCustody concerning such proposed arrangements as any Beneficiary may provide to FCAM and FCustody within twenty (20) Business Days of receipt of such notice. Unless and until such arrangements proposed to be made by FCAM and FCustody are approved by all of the other Parties and such approval to be considered provided sixty (60) Business Days following FCAM's and FCustody's written notice, FCAM and FCustody's termination will not be effective, and FCAM and FCustody shall not be released from any of their obligations herein;

9.2     Notwithstanding anything to the contrary herein, if the balance of the Collection Account is not sufficient to cover banking fees and expenses related to the Collection Account for a consecutive period of 12 months, FCAM shall notify the Producer to request the payment of an amount reasonably required to cover banking fees and expenses. If the Producer (or any other Person) fails to pay the aforementioned amount within 15 Business Days, FCAM shall have the right to unilaterally terminate this

42

Agreement and close the Collection Account with immediate effect subject to notification of all Parties. The amount received shall be repaid from first Collected Gross Receipts to the Party (or other Person) who made the payment;

9.3     All the Parties (other than FCAM and FCustody) shall have the right to terminate this Agreement by unanimous written notice to FCAM and FCustody at any time subject to FCAM's right to FCAM's Remuneration and FCAM Expenses properly incurred, undisputed and unpaid at that date from Collected Gross Receipts, provided FCAM is not in material breach of its obligations under this Agreement at the relevant time. In addition, the majority of the Parties (provided Creative Wealth, AP and Producer must be part of such majority) shall jointly have the right to terminate this Agreement at any time if FCAM or FCustody is unable to pay its debts as and when they fall due or has a liquidator, receiver or other external administrator appointed to its assets or business or ceases or threatens to cease carrying on its business, by giving to the other Parties not less than one (1) Business Day notice of such termination. The Producer shall have a fifteen (15) calendar day cure period (commencing from date of notice to Producer of default) in case any of the Parties, or any of the Beneficiaries claim the Producer is in default (material or otherwise) of this Agreement;

9.4     This Agreement may be terminated by a majority of the Parties (other than FCAM and FCustody) with immediate effect (provided that the Producer and Creative Wealth must be part of such majority) if (a) FCAM either commits a material breach of the terms of this Agreement (non-payment to Beneficiaries in accordance with the terms of Clause 4.10 shall always constitute a material breach) which is not remedied within ten (10) Business Days of written notice given by a majority of the Parties (other than FCAM and FCustody), in which Creative Wealth, and the Producer must be included, or (b) if FCAM shall enter into liquidation (except for the purpose of a scheme for amalgamation or reconstruction); (c) if any bona fide winding-up petition is issued against FCAM and remains undischarged for a period of twenty eight (28) Business Days or (d) if FCAM and/or FCustody are unable for reasons outside their control to carry out any of the provisions of this Agreement for longer than twenty (20) Business Days;

9.5     Upon termination pursuant to this Clause 9, the majority of the Parties (other than FCAM and FCustody, but which majority must include the Producer and Creative Wealth, who elected to so terminate this Agreement shall, within twenty one (21)

Business Days after such election is made, select a successor collection account manager and instruct FCAM and FCustody in writing (with a copy to the other Parties) to transfer the administration of Collected Gross Receipts less FCAM's Remuneration and FCAM Expenses (provided FCAM is not at the relevant time in material breach of any of its obligations under this Agreement) properly incurred, undisputed and unpaid up to and including the termination date to a successor collection account manager and FCAM shall administer the Collected Gross Receipts on the same terms as set out herein and FCAM shall cooperate with the Parties and any successor collection account manager in order to facilitate the handover of all information in FCAM's possession relevant to the Film and generally to ensure the efficient transfer of administration of Collected Gross Receipts in accordance with this Agreement. For the avoidance of doubt, the terms of the replacement collection agreement entered into with such successor collection account manager shall incorporate the provisions of Schedules 5 hereof and all relevant definitions related thereto. The Parties agree that any successor collection account manager shall be a generally accepted service provider in the business of managing collection accounts. In the event of a termination of this Agreement, FCAM is not authorized to close the Collection Account (and all Gross Receipts shall continue to be paid into the Collection Account and allocated as set forth in accordance with the Schedules attached hereto) until a replacement collection account has been agreed. If such instruction has not been received within the aforementioned period, FCAM may close the Collection Account, provided always that the Collection Account may not be closed until all Collected Gross Receipts have been transferred;

9.6    As from the date of termination pursuant to this paragraph and following transfer of all sums in or standing to the credit of the Collection Account to FCAM's successor account manager and the execution of a replacement collection account management agreement with the Parties and successor collection account manager pursuant to this Clause 9, FCAM and FCustody shall have no further obligation to perform their obligations hereunder and shall be fully released and discharged therefrom, without prejudice to any accrued rights and remedies of the Parties in respect of the period prior to such termination, including without limitation of the foregoing, FCAM's right to be paid FCAM's Remuneration and the FCAM Expenses (provided FCAM is not at the relevant time in material breach of any of its obligations under this Agreement) properly incurred, undisputed and unpaid up to and including the date of termination or the

Parties' rights against any of the other Parties, including, without limitation, FCAM, for any actions prior to the date of such termination, save that if FCAM and/or FCustody receive any Gross Receipts at any time after the date of termination they will remit any further monies immediately upon receipt of notification received from CA Bank of such Gross Receipts being credited to the terminated Collection Account, remit the same to the successor collection account manager without any set off or deduction (save for actual and verifiable standard bank transfer charges). Notwithstanding the foregoing, FCAM shall hold any Collected Gross Receipts in trust for the Beneficiaries after the date of termination of this Agreement until such Collected Gross Receipts have been transferred to the replacement collection account manager's account as required hereunder); and

9.7    It is expressly agreed that any Party who shall have no further obligation under this Agreement and who is not entitled to receive any (further) Entitlement hereunder, shall no longer receive Statements from FCAM or have the right to agree (or disagree as the case may be) on amendments hereto or terminate this Agreement as described in this Clause 9, and such Party's consent shall thereafter no longer be required where its consent is required.

## 10.    Notices

10.1    Any notice required or permitted to be given under this Agreement shall be in writing and sent by hand, first class-recorded or registered letter, email (with the exception of notices under Clauses 8 and 9) or facsimile addressed to the relevant Party at the Party's address, email address or facsimile number given in this Agreement, or such other address as provided by such Party in writing and according to this notice provision. FCAM shall provide copies of any notice received by FCAM from any other Party to this Agreement to all other Parties.

10.2    Any such notice sent by first-class recorded or registered letter shall be deemed to have been received five (5) Business Days after posting; any such notice sent by email shall be deemed to have been received upon the date of transmission from the sender's email system (if by email) provided that no subsequent transmission error is issued by the sender's email system (further provided that if email notice is transmitted on a day other than a Business Day or later than 5:00pm in the recipient's location,

such notice shall be deemed given on the next Business Day following confirmed transmission); any such notice sent by facsimile shall be deemed to have been received at the time of dispatch if during the recipient's business hours and otherwise at the commencement of the next Business Day of the recipient, provided always that the sender shall have received a successful transmission report or electronic receipt. Any such notice sent by hand shall be deemed to have been received at the time of delivery.

10.3    For the purposes of this Agreement, notices in email shall be considered to be in writing.

10.4    Upon written notification to all Parties, including FCAM, FCustody, new Beneficiaries may be added to this Agreement and Schedules 4 and 5 will be amended accordingly PROVIDED THAT for the avoidance of doubt, but without prejudice to Clause 5.10, no such new Beneficiary will be added without the prior written consent of all Parties and no such new Beneficiaries will be entitled to receive any monies hereunder, other than in respect of the notifying Party's Entitlement.

## 11.    Execution

11.1    This Agreement may be executed in any number of counterparts (each of which shall be deemed an original) and all of which, taken together, shall constitute one and the same agreement and any Party may enter into this Agreement by executing a counterpart. A counterpart signature page of this Agreement executed by a Party and sent by facsimile or transmitted electronically in either Tagged Image Format (TIFF) or Portable Document Format (PDF) shall be treated as original fully binding and with full legal force and effect and the Parties waive any rights they may have to object to such treatment;

11.2    If one or more Parties do not execute this Agreement, it shall nevertheless be in full force and effect as between the Parties that have executed this Agreement provided that this Agreement has been duly executed by at least each of the Executing Parties. This Agreement may not be amended without the prior written consent of all Parties. Any Parties who do not sign this Agreement will be treated as Beneficiaries.

12. **Severability**

If any of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law or for any other reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be altered or removed.

13. **Governing Law**

This Agreement shall be construed and performed in all respects in accordance with and shall be governed by the laws of the State of California, without regard to its conflicts or choice of law rules and the Parties irrevocably submit to the arbitration procedure contained in Clause 8.

**AS WITNESS** the hands of the Parties hereto the day and year first above written.

EXECUTED and unconditionally
Delivered as its Agreement by
**FREEWAY CAM B.V.**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**STICHTING FREEWAY CUSTODY**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**LUCITE DESK, LLC**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**BRON STUDIOS USA INC.**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA FINANCE CORP.**

_____

**AS WITNESS** the hands of the Parties hereto the day and year first above written.

EXECUTED and unconditionally
Delivered as its Agreement by
**FREEWAY CAM B.V.**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**STICHTING FREEWAY CUSTODY**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**LUCITE DESK, LLC**



EXECUTED and unconditionally
delivered as its Agreement by
**BRON STUDIOS USA INC.**



EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA FINANCE CORP.**

_____

DocuSign Envelope ID: B6F3B985-9926-4805-BD1D-2F61D8CEF7CB

**AS WITNESS** the hands of the Parties hereto the day and year first above written.

EXECUTED and unconditionally
Delivered as its Agreement by
**FREEWAY CAM B.V.**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**STICHTING FREEWAY CUSTODY**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**LUCITE DESK, LLC**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**BRON STUDIOS USA INC.**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA FINANCE CORP.**

DocuSigned by:

_Jason Cloth_

_____
BA609463EA86424...

DocuSign Envelope ID: B6F3B985-9926-4805-BD1D-2F61D8CEF7CB

EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA LENDING LP 2016**

DocuSigned by:

Richard M<sup>c</sup>Connell

23A44B5373614A2...

EXECUTED and unconditionally
delivered as its Agreement by
**CAST & CREW FINANCIAL SERVICES, LLC**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**ANNAPURNA PRODUCTIONS, LLC**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA LENDING LP 2016**

_____


EXECUTED and unconditionally
delivered as its Agreement by
**CAST & CREW FINANCIAL SERVICES, LLC**

_____


EXECUTED and unconditionally
delivered as its Agreement by
**ANNAPURNA PRODUCTIONS, LLC**

_____

EXECUTED and unconditionally
delivered as its Agreement by
**CREATIVE WEALTH MEDIA LENDING LP 2016**

_____


EXECUTED and unconditionally
delivered as its Agreement by
**CAST & CREW FINANCIAL SERVICES, LLC**

_____


EXECUTED and unconditionally
delivered as its Agreement by
**ANNAPURNA PRODUCTIONS, LLC**

_____ COO